Henderson, Judge. —
I concur in the opinion given by Judge Hat.x, and for the reasons given by him. The policy which induced the parliament of England to pass the statutes of Edward, was to encourage foreign merchants, and possibly artists, to come and trade with and reside among them. This policy is not only declared in the act itself, but in the act of Hennj 6. complaining of the construction given to an act of Henry 5. respecting the qualifications of jurors. In the colonial system, the policy was certainly inverted. Foreign merchants were prohibited from trading with us; and artists were certainly not encouraged, for it was the policy of the mother country to supply the colonists with manufactures of her *207 own production, and to keep the colonists engaged in the cultivation of the earth, to grow the raw materials for the manufactures of the mother country. As to those to-reigners who were mere cultivators of the soil, and who might possibly have been invited to settle among us, as we find frequently bodies of Germans, Swiss, and French, settling among us, the moment they arrived here for that purpose they were considered as colonists, having no intention to return; and therefore, having no interests sepc-rate and distinct from other colonists, they lost their alien character. A few years residence here was required only to ascertain their character, and to show that their object was a permanent residence; and then they becarnb entitled to all the rights and privileges of colonists from the mother country. Our ancestors, therefore, did not bring with them the statute of Edward. This law, I think, was territorial, and confined to England; it was unsuitcd to the situation of the colonists. If it was not brought with our ancestors, there is no act either of the colonial government, the mother country, or of our present government, which imposes it. The last act upon the subject enforces such acts of the British government as had been in force and use here, and were compatible with our form of government. If, therefore, it had not been in force before, that act did not enforce it. I am at a loss to declare the meaning of the words in use, as used in that act; I am now, and heretofore have been, much perplexed to ascertain its meaning; but I am satisfied that it, produces no such effect, as enforcing the act in question-I would mention, also, the various acts of our legislature on the subject of the qualification and appointment of jurors, as affording some evidence, although, I admit, not conclusive, that the law of Edward was not considered as being in force. I do not mean to say, that had the act of Edward been in force, that these provisions would repeal it, for I think that they might be made to stand together; but only as affording gome evidence that the law was not *208 in use, and'sufficiently strong to repel the evidence of its ^cing *a ,,scj arising from its having been used by Judge Williams once or perhaps twice at Wilmington; if such partial and' solitary inctances of its being in use would satisfy that word in the act of 1778.
I place no reliance on the report of the getlemen on the subject, who lately revised our statutes. That report was not either sanctioned by law or disapproved; it was simply ordered to be published. And if the question was dependant on its having a legislative sanction by such order of publication, I would say, that it was rather evidence that it had not. This subject ivas brought before the legislature by the report, and it was simply ordered that it should be published, without expressing any opinion thereon. It ivas saying, that it must depend on its own merits, we will neither giyc it our sanction or disapprobation.
I, therefore, concur with Judge Hah, that there should be judgment for the state.
Tayxoh, Chief Justice. —
It is difficult, perhaps impossible, to arrive at exact demonstration on a subject that involves the question whether an ancient British statute, passed nearly five hundred years ago, is now in force in this state. There are no certain guides to direct us in an inquiry of this sort; for the darkness that hangs over the early legislation and judicial history of this state, the dearth even of traditional knowledge, has left us little to resort to but general principles and reasoning, and no confidence that more can be done than grouping together the strongest probabilities. It is a matter of the highest duty, however, to make an honest effort to investigate the subject, in a case of such awful interest as the one before us, where, in all human probability, the life of a fellow being depends on our decision.
In order to ascertain whether the prisoner has been legally convicted, I shall consider two questions; 1st, *209 whether the statute of 28 Ed. 3. allowing to aliens a trial de medietate linguse, forms a portion of that statute law of Great Britain, which the first settlers of this state brought with them from the mother country; 2dly, if it does, then, whether it has been repealed, or superseded by any legislative act of our own.
It seems to be agreed by the writers on the subject, that colonists who settle a new and uninhabited country, carry with them the laws of the parent country as their birth-right, so far as such laws are applicable to their situation, and the condition of an infant colony; or in the language of an early act of assembly, the laws of England were, at the first migration of our ancestors, the law’s of this proyince, <•' so far as they were compatible with our way of living and trade.” (1715, sec. 1.)
The policy of the 28 Ed. 3. was, to encourage foreigners, merchants and others, to resort to that country, under an assurance that justice should be impartially administered to them; and that such a liberal mode of trial’ should be practised, in all controversies in which they were parties, as would prevent the operation of prejudice, and place them under no disadvantage, to be apprehended from their ignorance of the customs and manners of the people among whom they fount! themselves.
There is the highest evidence of the wisdom of this policy in relation to England; for when the statute of 2 Henrtj was afterwards enacted, that no person should pass on any inquest, unless he had lands and tenements to the yearly value of forty shillings, and a construction was put on this act which excluded aliens from the privilege of a trial de medietate linguse, the parliament interposed, and by the declaratory act of 8 Hen. 6. after reciting the mischiefs suffered from aliens leaving the kingdom in consequence of this construction, they declare, that the statute of Hen. 2. did not intend to change the mode of trial where an alien was a party; but was meant to prescribe the qualification of jurors? between de» *210 nizen and denizen. The act expresses an anxiety to give to the said merchant aliens “ the greatest courage and desire to come with their wares and merchandize into this realm.”
As the wealth of the parent state would increase with the prosperity of the colonies, any British statutes having a tendency to promote that object, were applicable to the circumstances of the new settlers. Immense forests were to be cleared, lands to be reclaimed and cultivated, -and various labours to be performed, to which capital, cnterprize and industry, were essential; and these were likely to be drawn from other sources besides the parent state, in the degree in which foreigners could be assured that they would enjoy a certainty oflegal protection.
The statute of 28 Ed. may have been supposed to have been a mere commercial regulation, from the words of 8 Hen. 6. « merchant aliens;” but the act itself says “ merchants and others.” It is true that more of the trading profession of persons resorted to England at that period, than others, yet no distinction was made between them and other classes of aliens: all were equally entitled to the privilege.
The mechanic arts, and the sciences, were then struggling into a feeble existence; and of course few foreigners could bring any improvements, or discoveries, into a country where they received their first and strongest impulse. But in after ages, it became the interest of Great Britain to introduce foreigners from states which rival-led or exceeded them in many of their manufactures; and it was equally important that this mode of trial should be allowed to all descriptions, as the means of extending their commerce through their manufactures, and of en - riching their country by the diffusion of useful knowledge. But at the present day, aliens are to be found in every state; some, impelled to leave their native country by religious proscription, or political intolerance; many inspired with the hope of improving their fortunes, or be *211 ing relieved from tbe anxiety of providing for their posterity, by the new and ever improving prospects opened to mankind by the salutary influences of a perfectly free government. All, however, bring with them, in a greater or less degree, the arts and industry that multiply the resources of man, or discoveries in science that give strength to his character, or embellishment to his existence.
But recurring to the early history of our own state, ft may be thought, that the system of commercial monopoly established by tbe navigation act, and which, probably, went into full operation about the time the first permanent settlements were made here, would prevent the access of foreign merchants, and thus render useless ami inapplicable the mode of trial now in discussion. That the colonial system would, in a very great degree, prevent an intercourse with merchant aliens, must be admitted; but it is evident, that the policy of that system was ■best promoted by giving encouragement to foreign agriculturists, and others, who would add to those productions of the soil which were exported to the mother country. The most advantageous employment of any capital to the country to which it belongs, is that which maintains there the greatest quantity of productive labour, and increases, in the greatest degree, the annual produce of the labour and land of that country. All the surplus produce of the colonies, which consisted in' what were-called enumerated commodities, could only be sent to England; and other countries must afterwards buy them of her.*
The policy of encouraging foreign settlers was invariably pursued by tbe mother country, particularly as to these thwi colonies. By this she was a great gainer, without any diminution of her own inhabitants. In Pennsylvania, upwards of four thousand Germans w ere imported in the year 1750.† The French Protestant refugees fled to Carolina in great number’s, from and after the re *212 vocation of the edict of Nantx* in 1685,* which was before the division of the colony into North and South-Carolina. Many years before the revolution, a considerable p0{jy 0f Palatines† migrated hither, and settled upon lands of which many of their descendants are, at this day, respectable cultivators. Swedes and Dutch from N. York, French from the line of posts on our frontiers, and Spaniards from our southern borders at St, Augustine, must often have found their way to this state, and, in the vicissitudes of human affairs, required the advantage of this mode of trial.
The colonies (says an elegant historian‡) which now form the U. States, may be considered as Europe transplanted. Ireland, England, Scotland, France, Germany, Holland, Switzerland, Sweden, Poland, and Italy, furnished the original stock of the present population, and are supposed to have contributed to it in the order they are enumerated.
But this position may be farther maintained by authority of the British parliament; for by the act of 13 Geo. 2. foreigners residing seven years in the American colonies, were naturalized; and by 2 Geo. 2. foreign protestants, serving in royal American regiments for two years, were naturalized. Still those foreigners might require the allowance of this mode of trial, until their right to naturalization was complete by the prescribed term of residence; and I think it probable, that the demands and necessity of it, would be not less frequent here than in England, in proportion to the difference of population.
For it is a well known fact in the history of national manners, that the mass of the population of the two rival nations, England and France, was formerly nurtured in inveterate prejudices against each other; and we cannot suppose that the minds of our ancestors were purified from the taint of the parent hive by a transatlantic *213 voyage. It may well be believed, that a Frenchman, tried for his life in N. Carolina, before the revolution, would as earnestly invoke the protection of the stat. of 28 Ed. S. as if he were tried in England; and when we look at the habits and rank in life of the early settlers, who were to form his jury, would stand in equal need of it. “ For a long time it was but ill inhabited, and by an indigent and disorderly people, who had but little property and hardly any law or government to protect them in what they had.”* Happily, these prejudices are now no more than matters of history; they haye been dispelled by the lights of knowledge and the genius of our institutions. Hut though an alien of any description, has at this day nothing to fear from the operation of malignant passions, he might labour under many disadvantages, from our ignorance of his language and the customs of his nation. If these may be obviated by allowing him a portion of his countrymen, or foreigners, upon his jury, in case of life or death; if by these means he will be better enabled to bring forward his defence to the consideration of the Court and jury; and if there is no positive law directing us, in plain and intelligible language, to disallow the claim, it appears to me safer to follow in the footsteps of our forefathers.
In a case of this importance, I cannot overlook what has been the practice of our predecessors, men who belonged to the profession before the revolution, and maybe supposed to have practical knowledge of what was then the course of criminal trials. These venerable persons formed a sort of connecting link between the present age and the past; and, as they have always allowed the claim of a jury de medietate linguae, whenever it was demanded, it is reasonable to suppose that such was the custom before their time.
The statute in question, though seldom called into action, appears to me, from these several views of the sub *214 ject, to have been in the number of those which our ancestors brought with them: not less so than many others which influence our daily transactions, and to doubt the existence of which would throw rights and property into the utmost confusion.
2. No inconsiderable light is reflected on this question by what has been already mentioned relative to the stat. of lien. 5. for that made a general, law for tiie qualification of all jurors, in terms as comprehensive as any of our acts of assembly; yet the parliament afterwards declared, that they were not, and did not intend, legislating upon the special case of a jury de medieiaic lingnse.
Farther, the statute of 27 Eliz. ch. 6. requires the jurors to have an estate of freehold of the yearly value of 41. The words are, “ that in all cases where any jurors are to be returned;” yet it was held, that this statute did not extend to this mode of trial. [Cro. Eliz. 841.)
To ascertain whether a later statute repeals a former one, it is necessary to inquire whether the later statute is couched in negative terms, or whether its matter is so clearly repugnant that it necessarily implies a negative. None of the acts on this subject relate to any cases, but those between the state and a citizen, or between citizens. When they prescribe or alter the qualifications of jurors, the acts must be supposed to speak with a retrospect to those cases where some qualification in point of property was necessary to a juror, and not to those cases where no such qualification ever had been required.
A freehold qualification of some sort, was always necessary to a juror by the common law, (Litt. sec. 464. C. Litt. 157 a.) and it would seem to do violence to the intent of the legislature, to construe acts making provision for general and ordinary cases, as repealing laws made for peculiar cases and wholly of an anomalous character, most probably liot within their contemplation at the time. The course of judicial exposition fortifies this idea; for by the 32 Hen. 8. inhabitants of corporate towns, *215 ■worth 40s. in goods, may try felonies in sessions and jail deliveries for such towns, and this is not repealed by subsequent acts concerning jurors. There is nothing, in any of our acts, which prevents them from being carried into complete execution, in perfect harmony with the law relative to aliens. Nor do I perceive that the force of this general reasoning is impaired by the statute of 5 W. cj* M. having introduced an exception of this mode of trial, in an act prescribing the qualifications of jurors. This was done from abundant caution, and to avoid the danger of misconstruction which had formerly arisen under the statute of iTen. 5. But, doubtless, without this exception, the courts would have made a like exposition, according to the cases before cited. I am therefore of opinion, that the prisoner is entitled to a new trial.
By a majority of the Court,
Judgment ateirmer.

 Smith’s Wealth of N tions

 2 ‘Settlements in America, 201.

 1 Eamsay’s Hist. U. States.

 1709, Williamson’s Hist. N.Carolina,

 1 Ramsay’s Hist, of the U. States.

 Settlements in Amerita, 3S6.